IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TECT AEROSPACE WELLINGTON, INC.,

Plaintiff,

vs.                                    Case No. 07-1306-JTM

THYSSENKRUPP MATERIALS NA, INC.,
a Michigan Corporation,
and its unincorporated division,
TMX Aerospace (d/b/a TKX Aerospace),

Defendant.

MEMORANDUM AND ORDER

This matter is before the court on the motions for summary judgment by plaintiff TECT
Aerospace Wellington, Inc., and by defendant ThyssenKrupp Materials NA, Inc. For the reasons
stated herein and with specific exceptions, the motions are denied.

Many of the pleadings or evidence submitted in connection with the parties' summary
judgment motions have been filed as sealed, or – pursuant to an agreement between the parties –
marked as "Confidential" or "Highly Confidential." The court was presented with a similar situation
in *Vulcan Materials v. Atofina Chemicals*, 355 F.Supp. 1214, 1216-17 (D. Kan. 2005). The court's
Order in *Vulcan* resolving the summary judgment motion in that case was initially filed under seal,
with a directive that the parties should then "specify which portions, if any, of the present order they
contend should remain under seal, along with the specific justification which the party or parties
contends overrides the general public interest" in the disclosure of court orders. *Id.* at 1217.

The court stressed the "[d]isclosure of the basis for a court's orders is the rule, not the
exception." *Id. See also Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1179 (9th Cir.
2006) ("the resolution of a dispute on the merits, whether by trial or summary judgment, is at the

heart of the interest in ensuring the public's understanding of the judicial process and significant public events") (internal quotation omitted); *Joy v. North*, 692 F.2d 880, 893 (2nd Cir. 1982) ("documents used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons"); *In re Ins. Co. of N. Am.*, No. 08-CV-7003, 2008 WL 5205970, *2 at n. 2 (S.D.N.Y. Dec. 12, 2008), *vacated on other gds.*, 2009 WL 238154 (S.D.N.Y. July 29, 2009) ("the greatest possible weight is to be given to the presumption of public access to the documents that directly affect this [summary judgment] decision").

Only the defendant in *Vulcan* sought redaction of any part of the court's Order, a request the court denied, noting that "no evidence of actual or likely harm has been presented by defendants; their assertion of potential future harm is simply the uncorroborated argument of counsel." The court concluded that the defendant's showing failed "to counterbalance the strong interest in open public access to rulings of the court," and directed the Clerk to unseal the entire Order. *Id.*

Accordingly, the present Order is hereby filed temporarily under seal. The parties shall have ten days from the date of this present Order to show cause why any particular portion of the Order should be redacted.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

2

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**The Parties**

TECT Aerospace Wellington, Inc. is a Wellington, Kansas custom manufacturing services supplier to the aerospace industry of semi-finished and finished components and assemblies, including airframe structures, aircraft assemblies, solid and hollow fan blades, and other hardware. In August 2005, TECT Aerospace, Inc. purchased the stock of BAE Systems Precision Aerostructures Inc. ("BAE") and changed the name to TECT Aerospace Wellington, Inc. ("TECT").

BAE and TECT build airplanes and airplane components. At all relevant times, Cessna was a major customer. TECT machines Cessna's spar assemblies, the backbone of Cessna's Citation, and then assembles the wing, tail and fuselage components.

TMX Aerospace ("TMX") is an independent service center that supplies raw materials to airplane manufacturers and to airplane parts and components manufacturers. TMX is an unincorporated division of defendant ThyssenKrupp Materials.

3

BAE had a long term contract with Cessna to produce certain airplane component parts based upon Cessna's technical specifications and part drawings.

In May 1997, Russell J. Mirt started work as the Procurement Manager of the TECT Wellington plant (then owned by GEC Precision Corporation, a predecessor to BAE). After the Wellington facility was acquired by BAE, Mirt became that company's director of supply chain management. Mirt managed the purchasing/procurement department until he was terminated by TECT on January 3, 2006. As manager, Mirt, among other things,  sought vendors of raw materials, negotiated prices and contracts with vendors, reviewed technical specifications, forecasted material requirements, determined quantities of materials to purchase, and determined the timing of incoming material deliveries. "Buyers" working for Mirt prepared purchase orders and submitted them to Mirt for review. Depending upon the amount of the order,[1] Mirt would either approve the order or send it to the President of the company for approval.

In August 2000, Lee Martin  was employed by BAE as a Buyer at the Wellington plant. In January 2006, Martin succeeded Mirt as the procurement manager. Martin continued working at the plant through December 31, 2006.

**The Long-Term Agreement**

In 2002, while the aerospace industry was still in a period of contraction, Mirt put the aluminum plate requirements in support of the Cessna programs out for competitive bid. Mirt oversaw the preparation of the request for quotation ("RFQ") to various aluminum plate suppliers, answered bidder's questions, analyzed the bids, and made the decision as to which bidder was the "best valued source . . . to hammer out a contract with." (Mirt dep. at *48*).  Martin prepared the RFQ, which included a spreadsheet that included a forecast of aluminum plate requirements from 2003

---

[1]Mirt's signing authority was $100,000.

through 2007. The forecast was based upon Cessna's forecast of airplane build rates, which Cessna called its "schedule-at-a-glance." These forecasts were loaded by the Wellington plant into a computerized Material Requirements Planning ("MRP") system for ordering and scheduling materials for the parts to be produced by the plant. The MRP system generated forecasts of material requirements to support Cessna's build rate.

Martin believes that TMX Ex. 120 is the spreadsheet he prepared as part of the RFQ. The far left column in TMX Ex. 120 lists certain parts BAE produced for Cessna. There is a row for each part. The first ten columns show the technical specifications for the plate required for each part; the next ten columns show forecasts of "the total number of plates and pounds of metal [BAE] would need to support the current build rate for Cessna" for each year from 2003 through 2007. (*Martin dep. at 37, 39*). The far right-hand column, captioned "mill price per pound," was left blank so that bidders could insert their prices.

The spreadsheet includes the following yearly totals for aluminum plate in pounds needed by BAE:

| Year | Total for Year | Per month |
|------|----------------|-----------|
| 2003 | 343,227 | 28,602.25 |
| 2004 | 426,657 | 35,554.75 |
| 2005 | 464,031 | 38,669.25 |
| 2006 | 475,489 | 39,624.08 |
| 2007 | 482,668 | 40,222.33 |

TECT correctly notes the spreadsheet itself contains no calculations for monthly production, and that the spreadsheet was not formally a part of the RFQ, which specifically provided that the buyer did not guarantee any specific quantity because the actual requirements would fluctuate.

5

The bid forecast was Martin's best estimate, though he knew that the actual requirements could vary. He intended the forecast to provide the center around which any variance would occur. Mirt and Martin expected each bidder to rely on the forecast as the basis for the bidder's quote and to use the forecast to obtain commitments from aluminum mills to cover the requirements. Mirt testified that he also expected the bidders to "make sure that the allocations, meaning the – space, the capacity for that production amount would be coordinated with a mill to ensure they could support it...." (Mirt dep. at 51).

Martin sent the RFQ to various prospective bidders, including to TMX, along with a cover letter requesting a quote. The spreadsheet described above was enclosed with the letter.

At TMX, the RFQ and bid spreadsheet was received by Business Development Manager Shane Swift[2] and Commercial Sales Supervisor Bonnie Jackson. Juergen Funke, TMX's President, directed Jeff Luckasavage (Vice President of Sales and Marketing) to negotiate with BAE.

Swift worked with aluminum mill Pechiney Rolled Products (later Alcan) to obtain a quote. Typically, the mills are interested in seeing plate specifications, estimated quantities required, and the time period during which the mill orders would be placed. They use this information to price the material and determine whether they have sufficient mill capacity to cover the estimated requirements. They also use this information to hedge or secure the input metal ingot at the appropriate times to stabilize their costs and to support firm fixed pricing. Typically, the aluminum mills ask for a forecast of requirements and the time period of the contract.

Swift reformatted BAE's spreadsheet so that it was in the form that Pechiney preferred, and sent the spreadsheet to Pechiney. In response, Pechiney quoted prices and committed to the quantity of plate forecast in the spreadsheet for 2003 through 2007.

---

[2] Swift is employed by ThyssenKrupp Aerospace, a division of ThyssenKrupp Materials, CA, Ltd as the General Manager in Ste-Anne-de-Bellevue Québec, Canada. At the time of the RFQ, Swift was the Business Development Manager for TMX Aerospace. Before working at TMX, Swift was District Sales Manager for Pechiney Rolled Products, a division of Pechiney Rhenalu. His responsibilities at Pechiney included calling on distributors including TMX and calling on aerospace Original Equipment Manufacturers (OEM's).

On November 20, 2002, TMX submitted a quote in response to the RFQ. The quote consists of 1) a letter that states terms; and 2) the BAE spreadsheet that TMX used to show plate prices per pound for each part.  The price reflected the mill price plus TMX's markup.

On December 18, 2002, BAE asked all bidders to submit their "best and final" quotes. (Mirt dep. at 63-64). BAE also provided another spreadsheet showing requirements through 2008 and 2009.  Swift in turn sent BAE's revised spreadsheet to Pechiney and helped to negotiate prices with the mill. Although Pechiney recommitted to firm fixed pricing with 5% escalators for years 2003 through 2007, it refused to offer fixed prices in 2008 and 2009. For those years, the price would be P.I.E., otherwise referred to as "price in effect" pricing.

On January 30, 2003, TMX submitted its "best and final" quote, which was based upon Pechiney's quote. TMX again used BAE's spreadsheet to show its prices.

Although there was no formal agreement between the parties until the May 2003 Long Term Agreement (LTA), on February 4, 2003, BAE authorized TMX to order plate for four parts that were included in the RFQ. And on April 3, 2003, BAE issued to TMX three purchase orders (PO ## 67454, 67458, and 67461) for aluminum plate for Cessna part numbers. Originally the material was scheduled for delivery to TECT on April 13, 2003, for PO ## 67454 and 67461 and on May 9, 2003 for PO # 67258.

On behalf of BAE, Mirt, with Martin in a support role, negotiated the LTA. Martin, with input from Mirt, prepared the first draft of the LTA. Luckasavage, on behalf of TMX, negotiated and reviewed drafts of the LTA.

During negotiations, the parties did not discuss the macroeconomic environment affecting the demand for aerospace plate or the extent to which BAE's actual requirements could vary from the bid forecast. Swift and Martin did discuss the RFQ estimate. Martin said that this was BAE's best estimate based upon Cessna's forecasted build rates. Swift "wanted to make double sure that BAE had accurately forecast its requirements, so that we would know that TMX had covered those requirements with the mill, especially since the mill prices were depressed at the time." As to the

actual production requirements, Swift does not "recall that we ever discussed what that meant in terms of a maximum or minimum variance from the estimate." Swift Dec., ¶ 14. There is a dispute of fact as to whether there was any explicit assurance that future variances would be reasonable. According to Swift, Martin told him "that BAE's actual requirements could fluctuate up or down based upon Cessna's build rates, but that any such fluctuation would be within a reasonable range of the RFQ estimates." (*Id*.) According to Martin, he made no such representation. (Martin. Decl. at ¶ 5). It is uncontroverted that the estimates in the RFQ were the center around which any variance would occur.

TMX Exhibit 4 is a BAE spreadsheet, which is dated as of May 5, 2003. This spreadsheet shows BAE's forecast and reflects the prices that were used in the executed LTA.

TMX Exhibit 122 is the final version of the LTA, which was fully executed on May 16, 2003. The LTA is a "requirements contract."

Under the LTA, "Seller [TMX] will be the sole source to the buyer [TECT] for items listed in Exhibit A during the term of this agreement."(TMX Exh. 122). The agreement also provides that "[a]s required, Buyer will purchase from Seller the requirements on the enclosed attachment (hereafter referred to as 'Exhibit A') for 7050, 2024, 2324 aluminum alloy plate per this agreement." (*Id*.) The agreement provided:

> Buyer guarantees no specific quantity on any item to be purchased against this LTA. Buyer and seller hereby agree the quantities as noted in the individual purchase orders pertaining to the LTA are based on forecasted customer build rates and could fluctuate during the term of the agreement. Buyer hereby reserves the right to adjust these quantities to coincide with customer build rates at no cost to Buyer during the term of the agreement provided Buyer maintains sole source on the related machined parts.

(*Id*.) The LTA fixed the price for the aluminum plate to be provided, subject to 4% annual negotiated increases or decreases during years 2006 through 2009.

The LTA further provided

> Seller agrees to provide stocking, warehousing, and Just-In-Time (JIT) consignment services for aluminum plate requirements in support of Cessna Programs . . . Seller will stock and assume ownership of a minimum 6 month forecasted usage of all

8

contract items at all times. Seller will work closely with Buyer to coordinate and update forecasted aircraft build rates.

(*Id.*) Under the agreement, TMX was "allowed a shipping window of +/- 7 calendar days," and was "to maintain a minimum 100% on-time delivery performance, and a minimum 98% quality acceptance rating". (*Id.*)

The LTA was signed by BAE's president and by TMX's vice president of sales and marketing.

Under the agreement between TMX and Pechiney, prices were fixed through 2005, subject to a 5% escalator clause in 2006 and 2007, and then unfixed.

In 2003, TMX supplied BAE 329,770 pounds of aluminum plate or 27,481 pounds of plate per month, as compared to the bid forecast of 28,602 pounds per month.


**Expectations of the Parties**

In the wake of the September 11, 2001 terrorist attacks in the United States, airplane buyers cancelled or delayed airplane orders, and there was an abundant supply of relatively inexpensive aerospace aluminum plate. At the time of the LTA, according to the testimony of TMX vice-president Jeff Luckasavage, the aerospace market was "very weak." (Luckasavage dep. at 41-42). However, the parties did not discuss how much the future requirements might fluctuate under the LTA. (Id. at 42-43). Luckasavage has testified that in his experience, the "historical norm" for annual variances from bid forecasts is 15%. (*Id*. at 14).

On this issue, TECT cites the testimony of Andrew O'Conor, TMX's expert witness on the aluminum market, whose report states that (1) the market for aerospace aluminum plate is cyclical; (2) the cycle typically is seven to ten years from peak to peak; (3) increases in demand for aerospace aluminum plate could be sharp and steep; and (4) the rate of increased demand in and after 2004 were not unprecedented and indeed had been exceeded during a boom period in the 1990s. (O'Conor Report at 8-9). TMX responds that O'Connor's report is unsworn, and thus cannot be considered

as a basis for denying summary judgment. *Sofford v. Schindler Elevator Corp.*, 954 F. Supp. 1459, 1462-63 (D. Colo. 1997).

However, TECT also cites the deposition testimony of O'Connor and its expert, Robert Kelly. Kelly testified that by 2003

> we were at the bottom of the cycle, and at some juncture, and who in those days knew exactly when that would be, there would be a resurgence in demand for aerospace products. I can't tell you, you know, that that was going to be within two months or three months, or whatever, but it was going to be there sometime in the foreseeable future.

(Kelly dep. at 83).

Counsel for TMX then examined Kelly about when the industry rebound would occur:

Q.    But do you agree with O'Connor that industry insiders in 2003 were not able to predict when that turnaround would occur with any accuracy?

[A.]   If that were the only measure, I would say yes, but there were other measures, as cited in the [expert report] paragraph above, "In July of 2002, Boeing published its 'Current Market Outlook'." I think the point is here, Jim, that there were other indices that things would be picking up, that the cyclicality of the business, historic and even a spike up, to quote the TMX Aerospace Web page, was very possible, if not probable.

....

Q.    I understand. The entire industry may have known that there would be a recovery at some point, but my question really focuses on when that would occur.

A.    It would have been a forecast, correct, and forecasts –

Q.    Well, when you say "just around the corner," you said it could be two months, it could be five months. Could it be two years?

A.    It could have been.

Q.    Could it be five years?

A.    Probably not from the standpoint that the people that I have been associated over time have said, that the cycle -- and this is borne out to a certain extent by the data, that the period of time between the peaks in the cycle are from eight to ten years. That's not cemented in concrete, but it's a good rule of thumb.

(*Id*. at 84-85). He further testified: "if I were a marketing manager in 2003 and I knew my stuff, if I was familiar with the business, I would expect a surge upward impacting price going out into the

future. How long that would occur, when it would occur, I can't tell you, but I would be wary of assuming too much one way or the other." (*Id.* at 97).

TMX's expert has acknowledged that there was "extreme cyclicality in these kind of products." (O'Connor dep. at 136). He also testified that it was not possible for anyone to predict with any accuracy when the market turnaround would occur. (*Id.* at 148-49).

Economic conditions in the aerospace industry improved in the first quarter of 2004, and airplane build rates increased through the fourth quarter of that year. The market supply of aluminum plate began to tighten. Market prices for aluminum plate and mill lead times increased.

BAE's requirements for aluminum plate increased in proportion to Cessna's increased build rates. By 2004, Cessna's demands for parts were greater than BAE had forecast in 2003.

In a TECT employee newsletter distributed before Thanksgiving 2004, Mirt wrote

we jump from excitement to concern when we start thinking about the aluminum plate and sheet market. There is a huge shortage of these commodities right now due to the increased demand in the market. Some of the main reasons are the huge export demand to China, the Airbus A380 and the closing of the McCook plant this year. As this demand continues to increase and there is less capacity in the market, so does the pricing. In some cases we are now paying twice the amount for aluminum plate than we did this time last year. However, I'm very pleased to tell you that approximately 90 to 95% of our aluminum plate requirements are covered under LTA's established during the depressed market last year. I can't say we're that fortunate when it comes to our aluminum sheet requirements. While we do have some of it placed under LTA, there are still several key procurements we are paying a considerable amount for when compared to last year. It makes me wish we would have had a crystal ball and could have seen this coming. In talking to the aluminum mills, this surge in demand is unprecedented and there is no end in sight.

(TMX Exh. 128).

When the LTA was prepared in 2003, Mirt and Martin knew that the price of aluminum was at a historical low, and wanted to lock in that price by means of the LTA. However, neither Mirt nor Martin foresaw the aluminum plate shortage that began to develop in 2004 . Both men characterize the circumstances that created the shortage as a "perfect storm." (Martin dep. at 57; Mirt dep. at 93).

TECT argues that TMX's communications with it (TECT Resp. Exh. 10) and with Pechiney (TECT Resp. Exh. 9, 28, 29) show that TMX knew it was bound to supply TECT's demands. It also notes that, although TMX asked TECT to pay a higher price for increased requirements, it  refused

to do so, and TMX did not object, reserve any rights, or state that TECT's requirements were unreasonable. Instead, TMX continued to supply TECT's requirements just as it was obliged to do under the Long Term Agreement. (*Id.*)

The court finds that the suggested findings of fact are not supported by the evidence. That TMX tried to get additional allocations from Pechiney does not mean they felt they were *bound* to do so by means of the LTA. It could just as easily reflect a desire to satisfy a customer's additional requirements, even though they went beyond the bounds of the LTA. Further, the cited "communications" between TMX and TECT reflect merely a single e-mail in which TMX offered to supply additional allocation at "full-book" price – that is, a price outside the LTA. Similarly, the May 2005 letter from TMX to Pechiney recognizes that TECT was now forecasting significant additional requirements (885,148 pounds for 2006, and 837,157 pounds for 2007), but nothing in the letter indicates that TMX agreed that the increased requirements were a reasonable variance from the original estimates.

TECT argues that TMX never explicitly told it that its requirements were unreasonable, and claims that its communications show that TMX knew it was obliged to provide them. Again, the cited communications indicate simply that TMX sought additional allocations for TECT – including anodyne observations such as the fact that there was "a productive meeting with Pechiney" and that "we will obviously continue to work" on supplying increased allotments (TECT Dep. Exh. 109) – but they contain no indication that TMX conceded that it was obliged to provide the additional aluminum plate at LTA prices *even if the amount reflected an unreasonable variance*. To the contrary, TMX's communications to TECT consistently indicate that, to the extent such additional allotments could be provided, they would be priced outside the LTA.

**Performance under the LTA in 2004 and 2005**

In 2004, the aluminum mills resorted to allocation systems. Mill customers were given a monthly allocation that limited the amount the customer could receive. Under these allocation

systems, which continued through 2006, the amount of aluminum customers could receive was subject to a "cap" (Mirt dep. at 86), although customers in some months could negotiate for an additional amount at a higher price.

In November 2004, TMX advised BAE that, beginning in February 2005, Pechiney had allocated only 30,000 pounds per month for the BAE/Cessna contract.

In 2004, TMX supplied BAE 361,169 pounds of aluminum plate or 30,097 pounds of plate per month, as compared to the bid forecast average of 35,554 pounds per month. At the same time, BAE estimated that its aluminum plate requirement for the following year (2005) would be approximately 55,000 pounds of plate per month as compared to the forecasted average of 38,669 pounds per month, a 42% increase.

In 2004 and 2005, each party on various occasions sent to the other party e-mails reporting on the status of open orders. TMX's emails to TECT contained the original BAE RFQ spreadsheet. These e-mails containing the RFQ spreadsheet were received by Mirt of TECT, and were forwarded by him to other officers of TECT. No one from TECT objected to TMX's continuing reliance on the RFQ spreadsheet.

In 2005, the recovery at Cessna was in full swing, where the company's build rates were increasing. The challenge within the supply chain was to increase the mill allocation to cover Cessna's build rate.  Even with the allocation system in place, in January 2005, the mills could not keep up with demand and were "sliding" or pushing out delivery dates on orders.

For the months of March and April 2005, TMX was able to secure from Pechiney an allocation of approximately 55,000 pounds per month to support the BAE/Cessna contract. However, by April 2005 TMX had not covered BAE's additional requirements for the remainder of the year.

In April 2005, Pechiney offered TMX an additional 22,000 pounds of material per month to support BAE, however, TMX would be required to pay a premium amount for the plate based

upon a "full-book" price, rather than the mill contract price. Luckasavage offered this additional tonnage to Mirt based upon a price that was greater than the LTA price.

Mirt and Luckasavage discussed the fact that BAE's 2005 requirements exceeded the bid estimate. It was clear to Mirt that Luckasavage believed that TMX's obligation was to provide an amount that was within a reasonable variance of the bid estimate.

BAE rejected TMX's offer. Mirt wrote by e-mail that under the LTA, the forecasted requirements were "based on customer build rates that could fluctuate during the term of the agreement," and that accordingly the LTA price was controlling. (TMX Dep. Exh. 141)

In 2005, TMX supplied BAE/TECT 614,770 pounds of aluminum plate, averaging 51,231 pounds per month as compared to the bid forecast average of 38,669 pounds per month.


**The LTA in 2006**

TECT projected that for 2006 it would need 60,000 pounds of plate per month, compared to the bid forecast of 39,624 per month, a 51% increase. In November 2005, TMX obtained from Alcan an allocation for 2006 of 60,000 pounds per month to support the BAE/Cessna contract.

In a March 22, 2006 e-mail, Martin reported to TMX that TECT's 2006 requirements had increased to 66,000 pounds of plate per month and that TECT needed 200,000 pounds of plate by April 2006. Martin wrote, "I know TMX can't support this with current allocations but we need to see what you can do."  (Martin dep. at 109-110).

Martin had "multiple discussions" with "Matt [Melaik], Rick [Dulohery], Jeff Luckasavage . . . probably everybody [at TMX] at some point" about the fact that by 2006 "our requirements had more than doubled as opposed to what we originally forecast" in 2003. (Martin dep. at 111). Martin believed that TMX was "doing everything they could." (*Id*. at 112).

Matt Melaik, TMX's then Aerospace Sales Manager and Director of Business Development, recalls that during these discussions he and Martin talked about "how Cessna's build rates have exploded since 2003 beyond the expectation of the parties." (Melaik dep. at 121-122). Martin also

told Melaik that "we're in a different environment than we were when the LTA was signed." (*Id.*) Martin has stated that he cannot recall this conversation. He has not averred that he did not make such statements.

On May 18, 2006, TMX advised Martin that the mill would not increase the allocation to 66,000 pounds of plate per month. Martin forwarded this message to various managers at TECT and wrote, "I am quoting material outside of the [long-term] agreement and will advise on any availability." (Martin dep. at 125-26).

The parties experienced slides, or delays in delivery, during the course of performance of the LTA. Jo Nishikawa of TMX testified that the slides were severe and continuous. On July 10, 2006, TECT made a $569,500 spot buy of 34 plates or 64,000 pounds from Sigma Metals for delivery in October and November 2006. TECT paid $8.59 per pound, compared to the LTA price of $2.45 per pound.

TECT contends that it was forced to make this spot buy because of TMX's failure to perform under the LTA. However, the cited evidence shows simply that TECT had to make the spot buy to satisfy Cessna, not that it did so because of some breach by TMX. TECT's president testified that he believed the additional costs of the spot buys should be paid by Cessna, which was rapidly increasing its production. Martin recognized that TMX had "averaged shipping 63,000 pounds per month to us this year, which is more than they committed to at 60,000 pounds per month." ((TMX Exh. 196).

Martin never asked TMX to pay the difference between the cost of the Sigma Metals purchase and the LTA price. David Nolletti, Martin's supervisor, later wrote to TMX that it was in noncompliance with the LTA and that they would be "held responsible for costs incurred by TECT," although he did not single out the costs of the Sigma Metals purchase. (Nolletti dep. at 108-109).

TMX knew that TECT was planning to make a spot buy.

On July 12, 2006, Martin wrote an e-mail message to various managers at TECT in which he suggested that TECT request a price increase from Cessna to cover the difference between the

cost of spot buys and the LTA price. Martin attached a proposed letter to Cessna asking for the price increase:

> Beginning in 2003, TECT Aerospace (then BAE Systems) placed an aluminum plate LTA with TMX aerospace (non-Boeing division) to support Cessna requirements through 2009. Using projected build rates in 2003, it was determined that we would be consuming approximately 30,000 pounds per month. Cessna build rates have continued to increase since 2003 and consumption to date has increased from 30,000 to 70,000 per month. With current aluminum market conditions, TMX and their supporting mill, Pechiney, have been able to accommodate and commit to only 60,000 pounds per month in support of the LTA. Our available allocation will no longer support the increased demand.

(Martin dep. at 138-140; TMX Exh. 97 (C).

On August 9, 2006, TECT's program manager sent a letter to Cessna asking for a price increase. The letter uses verbiage from Martin's July 12, 2006 proposed letter to Cessna.

Some of the plates supplied by TMX to TECT were used for parts that were sent to Avcorp, which was also under contract with Cessna. On August 16, 2006, Martin wrote the following e-mail to Avcorp:

> Our constraint has been with the ability of the mill to accommodate all of the rate increases we've experienced since the inception of our plate contract in 2003. In summary, monthly tonnage requirements have increased from 30,000 pounds per month in 2003, to over 70,000 pounds per month at current build rates. Pechiney has been able to accept and accommodate our increased demand up to 60,000 pounds per month. As is common in the metals market today, we have consistently experienced mill slides and shortages, which we continue to appeal. It is only recently that TECT has been forced to place spot buys on the open market to support tonnage not covered in the plate agreement.

(Martin dep. at 145-47; TMX Exh. 201). Citing this email, TMX stresses the conclusion of the last sentence – Martin's observation that the spot buys were for tonnage "not covered in the plate agreement."

In the summer of 2006, Martin told TMX that TECT would require approximately 900,000 pounds of plate in 2007 or 75,000 pounds of plate per month. The 2007 allocation from Alcan (the former Pechiney), was 60,000 pounds of plate per month.  Martin thus projected a shortfall in 2007 of 15,000 pounds of plate per month.

TECT argues that TMX never objected to the new, increased requirements, and that the defendant knew in May of 2005 that the demand in 2006 and 2007 would be around 900,000 pounds. However, while the evidence shows that TMX learned that TECT would be seeking this much aluminum plate, the record does not support the conclusion that TMX agreed that the amount sought was consistent with the LTA. Rather, the evidence shows that TMX did complain, and that its attempts to obtain additional aluminum plate allocations from its supplier was merely an attempt to accommodate TECT – at an increased price which it intended to pass along to TECT – rather than an admission that such increased requirements were required by the LTA.

In November 2006, TECT made a second spot buy, for 3,763 pounds of 6" plate from Copper & Brass Sales.  TECT paid $8.02 per pound, compared to the LTA price of $2.45.

David Notlletti wrote that without additional supplies of plate, Cessna production would shut down and TECT would try to pass on any resulting consequential damages to TMX. Martin also wrote to TMX asking for delivery "at the contract price" and "strongly urg[ing] TMX to support our LTA by any means possible."

Although Martin believes that some of the mill slides were inconsistent with the LTA,[3] he also testified that TMX had "done everything that they could reasonably do to secure the allocation for 2007." (Martin dep. at 153).  He testified that TMX had "more than doubled what our original forecast was, [and that] that you can't do business with a company and expect them to take a loss like that." (*Id*. at 112-113).

Martin is certain that he had conversations with Melaik of TMX about needing an additional 15,000 pounds of plate per month in 2007, but during his deposition he could not remember "when, where, or what the content was." (*Id*. at 151). Melaik has testified that he and Martin discussed the increased 2007 allocation. What was said during this conversation is controverted. According to Melaik, Martin told him, "Look Matt, I know that we're beyond what we could do in normal

---

[3]Martin also testified that these mill slides were at least in part the fault of Cessna's frequent changes in delivery date. (Martin dep. at 87).

circumstances." Martin further told him that "Cessna's build rates have gone up again *beyond expectation*," and asked, "what can you offer me . . . to get me 900,000 pounds." (Melaik dep. at 214-15) (emphasis added). Martin told Melaik that TECT "would be willing to pay more for the additional tonnage." (*Id*. at 235).

TECT has submitted an affidavit by Martin which states that while he cannot recall this conversation precisely, he does "not believe such a conversation occurred as described by Melaik." (Martin aff. at ¶ 8).

TMX challenges the evidentiary value of this affidavit, stressing that in his deposition Martin was asked about the conversation and said only that "I really don't remember any specific details of the conversation." (Martin dep. at 150-51). The court finds that the potential inconsistency, while it may be grounds for cross-examination of Martin, does not establish the sort of unequivocal contradiction which would support the exclusion of Martin's affidavit. Allowing all inference in favor of TECT (as the party opposing the requested finding of fact), a rational fact-finder could conclude that a witness might testifying truthfully that, while he could not remember precise details of what he *did* say in a conversation, he knows what he *would not* have said. Accordingly, the court finds that a fact controversy exists as to what was said in the conversation.

**The October 2006 Letter Agreement**

TMX obtained a quote from Alcan for 75,000 pounds of plate per month. Because TMX paid the mill a premium to secure the additional allocation of 15,000 pounds per month, Melaik offered to Martin 60,000 pounds of plate at the LTA price, and 15,000 pounds of plate at the published mill book price.  Martin agreed to the proposal.

Jo Nishikawa of TMX sent Martin two drafts of a letter agreement. Martin signed the first October 13, 2006 letter agreement on a line provided for his signature as Purchasing Manager for TECT Aerospace, and e-mailed Nishikawa a copy of the executed agreement. The text of Martin's

e-mail states: "Jo, Attached is a signed copy of the agreement to proceed with an additional 15,000

lbs at mill book pricing." (TMX Exh. 205).

Nishikawa called Martin and told him that she needed to add a sentence to the October 13,

2006 letter agreement and that she would send a revised letter for signature.

Nishikawa then e-mailed Martin: "Lee, Please see the attached revised letter. * shows the

added sentence per our conversation." A revised letter agreement was attached, with the following

sentence added: "Since TMX is committing the aforementioned volume with the mill, TECT agrees

to purchase 75,000 pounds per month or 900,000 pounds over the course of 2007." (Martin dep. at

161). Martin signed the second October 13, 2006 letter agreement, again on the on a line provided

for his signature as Purchasing Manager for TECT Aerospace. Martin e-mailed Nishikawa a scanned

copy of the executed agreement.

> The second October 13, 2006 letter agreement states:
>
> Based upon the ongoing discussions regarding the material requirements for the Cessna program in 2007, it was determined that 60,000 pounds was not sufficient to support the increase in build rate. We teamed with Alcan to secure an additional 15,000 pounds per month for the 2007 contract.
>
> We are pleased to offer 75,000 lbs per month Alcan products for 2007 deliveries with the following price conditions:
>
> > • 60,000 pounds per month will be offered at the contract price (4% price increase from 2006).
> >
> > • 15,000 pounds per month will be offered at published mill book price.
>
> Per your voicemail you left with Matt Melaik, please review this letter, sign and fax it back today to reserve your allocation for 2007.
>
> Since TMX Aerospace is committing the aforementioned volume with the mill, TECT agrees to purchase 75,000 pounds per month or 900,000 pounds over the course of 2007.

(TMX Exh. 207). The additional 15,000 pounds per month was provided at a rate higher than the

LTA price.

There is a fact dispute between the parties as to whether Martin had the authority to bind

TECT when he cited the October 2006 letter agreement. In its Response to TMX's motion, TECT

(citing the deposition testimony of Notlletti) argues that Martin did not have authority, as its purchasing manager, to change the provisions of the Long Term Agreement, only the authority to solicit quotes from vendors. TECT contends that Martin was a lower level manager who had no authority on his own to modify or alter the terms of the LTA.  TMX argues that Martin had either the actual or apparent authority to bind TECT. The court finds an issue of fact exists as to Martin's actual or apparent authority.

Alternatively, TMX contends that TECT has agreed through pleadings that it ratified through performance the October 2006 letter agreement. However, the cited pleadings (TECT's response to an interrogatory and its Answer to TMX's Counterclaim) do not support an award of summary judgment on the issue. Both pleadings indicate that TECT agreed only that its subsequent performance "ratified this price change" for amounts in excess of 60,000 pounds. There is no indication that TECT has agreed that it ratified the additional commitment in the letter agreement to buy 900,000 pounds of plate in 2007.

Following the October 2006 agreement, TMX notified TECT that the 2006 price would remain for delinquent 2006 tonnage.

**The LTA in 2007:  Negotiations and Cancellation**

During the course of 2007, the parties engaged in extensive efforts at negotiating their differences. Ultimately, on August 1, 2007, TMX cancelled the LTA.

By early 2007, TECT began to experience cash flow issues. TMX has presented evidence showing that TECT's financial condition was precarious. For the Wellington plant, gross margins (what remains from sales revenue after a company has recovered the cost of goods sold) as a percent of sales dropped from 15.1% in the second quarter of 2006, to 9.8% in the third quarter of 2006, to negative 9% in the fourth quarter of 2006. Tim Hassenger, President of TECT Aerospace, considers gross margin as one indication of the efficiency of a business turning raw materials into income. At the end of 2006, with total annual sales of $56,570,000, TECT posted an annual loss of net income

of $1.4 million and a fourth quarter loss of $1.9 million. As a percentage of net revenues for 2006, earnings before interest and taxes ("EBIT") was 3.7 percent. For the fourth quarter of 2006, EBIT as a percentage of net revenues was a negative 13.3%, and for the month of December 2006, EBIT as a percentage of net revenues was a negative 26.3%.

TECT had negative EBIT every month from January through July of 2007 for a total loss of "something like 2.7, 2.8" million dollars. (Bowser dep. at 61-62). Profitability is a key indicator of financial performance. TECT's accounts receivable increased from $6.3 million at year end 2006 to $7.6 million in July 2007, while its accounts payable increased from approximately $5.4 million at year end 2006 to $10.7 million in March 2007, before falling to $5.9 million in July 2007. Through the end of 2006, TECT's labor costs, material costs and scrap rates were all rising.

TECT argues that there is no evidence that TMX knew any of this information. TMX has responded that the evidence is preemptively relevant – to stop the plaintiff from saying that TMX could not feel insecure because TECT was in fact in great shape. But TECT does not appear to argue otherwise. In the absence of any such claim, the evidence cited by TMX as to TECT's actual financial condition is of marginal relevance. What matters is what TMX knew of TECT's condition.

The payment term in the LTA was "net 30" days. On August 22, 2005, Martin had sent Luckasavage a letter about TECT's acquisition of BAE. In the letter, Martin asked for "extended payment terms of net 45 on all current and future purchases." Luckasavage approved the request.

In February 2007, TMX put TECT on hold because of past due invoices. As of February 13, TECT owed TMX approximately $470,000, although not all of this amount was past due. Martin then asked TMX to increase the credit limit, which TMX increased to $400,000.

In a February 20 e-mail, TMX told TECT that it had exceeded its credit limit. The message states, in part: "[T]here are some unpaid invoices that need to be taken care of. Our finance called your payable and left a message. Unfortunately 23 PO 113457 release 5 (3 pcs) cannot be released until it is solved." (TMX Exh. 40). TMX suggested a payment plan.

21

Jo Nishikawa has explained TMX's credit policy as follows: "Depending on their open, what do you call it, their credit limit, we were able to ship up to the amount. If they exceeded it and they haven't paid, we couldn't release any orders on the floor to print on the floor to ship out to TECT." (Nishikawa dep. at 96).

On February 20, Nishikawa asked the finance department to increase TECT's credit limit. On February 21, a person in finance responded to Nishikawa by e-mail,

> We will require current financial statements. Please request from TECT. Their credit limit is currently $400,000, their total aging is currently $561,102.38; how much additional credit are they requesting? We increased TECT terms to net 45 back in early 2006; however, we often have to call and request payment.

(TMX Exh. 40).

On February 21, TMX sent an e-mail to TECT describing a telephone conversation with Dorothy Dupree, one of TECT's Buyers. The e-mail acknowledged a voice mail indicating that a check was being sent for the past due invoices, and that accordingly the pending order would be released. However, the e-mail also asked TECT to address the issue of paying invoices "after your net 45 terms," and stated: "If TECT still requires a credit increase, please let us know how much more your [sic] requesting and send your current financial statements . . . ." (TMX Exh. 40). Nishikawa confirmed that material could be delivered the following day, and Dupree forwarded this message to Stacey Wiley, a TECT Financial Analyst, who forwarded the message to TECT Aerospace's CFO and TECT Wellington's Controller, with the message, "Another supplier not happy about how we are paying . . . they need financials to increase our credit limit as well." (TMX Exh. 41)

During an internal meting at TECT, on or about February 22, Ray Campbell, TECT's Interim Purchasing Manager, was asked to identify the "major material buys in April and May" to "see if some of them can be pushed out." (TMX Exh. 26). Campbell's assignment was to work with Bert Neff, who was responsible for scheduling machining operations at TECT, to

> look at the amount of material that we had scheduled for delivery with those four—those four suppliers [Alcoa, Schultz, TMX and Universal], scheduled for

22

delivery in the months of April and May and to determine whether or not we could reschedule [delay] any of those buys.

(Campbell dep. at 40).

On February 26, TECT notified TMX that it had put all orders on hold until further instruction from TECT. As of March 9, TMX, at TECT's request, was still holding, rather than shipping, plate that TECT had ordered, with the exception of some 6" material.

During an internal TECT meeting on March 16, Campbell reported that

no more plate is being brought in unless it is approved by production. Currently TMX has 60K pounds on the dock but so far are being very cooperative. UAC [Universal Alloys] is also holding product on their dock and they are also cooperating. [W]e are putting deliveries in jeopardy if we do not start paying on the accounts.

(Def. Exh. 29). At the time, Campbell was "working with the financial folks in Wellington to assist them in prioritizing payments and working to develop payment schedules." (Campbell dep. at 56-57).

On March 16, Melaik and Luckasavage met with Campbell in Wellington, Kansas, where they discussed the renewal of the LTA, which was set to expire in 2009. Campbell told the TMX representatives that TECT was in "big financial distress" so that it was unable to pay its past due invoices, and lacked the means to pay those invoices in the near future. He discussed management personnel changes at TECT, which for Melaik raised a "red flag that something is wrong." (Melaik dep. at 24-25). He also said that rather than pay on a monthly basis, the separate mill premium, as identified in the October 2006 letter, of $54,000 per month for the additional 15,000 pounds of plate per month, TECT would pay it in a single lump sum at the end of the year.

TECT denies that these statements about its financial condition were made, and that Campbell in fact indicated TECT would pay the amounts owing to TMX. However, the evidence cited does not support the denial. TMX's requested fact does not assert that Campbell announced that TECT would *never* pay, only that he told Melaik and Luckasavage that payment would be substantially delayed. Further, as to what was discussed at the meeting, Campbell testified that he could not "recall specifically what it was about or when or any of the details." (Campbell dep. at

23

122). He also testified that the meeting "may have" included "a discussion of TECT's ability to pay TMX's past due invoices." (*Id.*)

Later the same day, Melaik and Luckasavage told TMX President Juergen Funke about TECT's inability to pay. They discussed TECT's financial condition and its inability to perform under the contract. Funke raised a concern about the possibility of a bankruptcy. Funke instructed Jim Wendle, TMX Finance Director, to put TECT on "credit hold." Wendle then put a hold on all shipments to TECT. Thereafter, the credit hold was never lifted.

In a March 19 e-mail, Bruce Oka of TMX advised Dorothy Dupree of TECT that "I have been notified by our finance department that your account is on Credit Hold. Looks like the top brass is looking into this until we get further notice from upper management, we cannot release any orders. I will keep you posted." (TMX Exh. 167). Campbell explained to other managers at TECT that during the credit hold TMX "won't ship and probably won't accept new orders." (Campbell dep. at 129).

As of March 28, Universal Alloys, Alcoa and Bralco, all suppliers to TECT, also had TECT on credit hold. Campbell was discussing payment plans with Universal Alloys and TMX.

Walt Bowser, TECT Aerospace's CFO, has acknowledged that by the first week of April, there had been "multiple e-mails by people over the course of that time" in which TMX insisted that TECT bring its payments current to 45 days. (Bowser dep. at 178). In addition, Wendle had sent TECT an e-mail asking for TECT's current financial statements.

In a March 21 e-mail, Melaik asked TECT to set up "a conference call with our finance folks and your controller this week." (TMX Exh. 46, at 3). During the subsequent March 30 call, Campbell said that TECT would pay six weekly installment of $96,000 "to get to 45 days." (Campbell dep. at 140). Campbell knew that TMX was holding 220,000 pounds of plate that was ready for shipment.

During a later conference call on April 2, TMX agreed that if it received a $93,000 check on the first day of the week, it would release $93,000 worth of inventory, provided TMX's Finance

24

Department approved TECT's financial statements. In connection with these discussions, Nishikawa had sent an e-mail asking Campbell to "advise which orders you would like us to release up to $93,000 per week." (TMX Exh. 171).

During an April 6 conference call, Bowser stated that TECT would not pay anything on the account before the second week, and more likely the third week, of April.

On April 24, Melaik wrote to Nishikawa an e-mail under the subject heading "TECT – next five years" in which he wrote: "Juergen wants to offer the mills a five year package for the TECT business starting in 2008, Would you (or Bruce or Dan) please consolidate the requirements into RFQ form for the mills?" (TECT Dep. Exh. 40). Nishikawa forwarded the e-mail to another TMX employee, writing, "Dan, For TECT Wellington Cessna Plate contract, firm pricing from Pechiney expires this year and it will be PIE basis. Juergen wants to offer the mills a five year package for the TECT business starting in 2008...." (TECT Exh. 23.)

A few minutes later, Nishikawa replied to Melaik:

> Matt, I was reading the contacts with TECT and Alcan, our price is firm with TECT for 2009 (max 4% increase per year) but we do not have fixed pricing with mills? That means we may lose more in year 2008 and 2009 depending on the mill price?

(*Id.*) Matt Melaik responded a few hours later stating: "That's correct. That is one of the reasons to try and negotiate a new 5-year deal now...." (*Id.*)

The same day, Melaik sent an e-mail to Bowser and others in which he wrote, "could we please have an update regarding the payment plan discussed on April 6?" (TMX Exh. 54). Campbell responded two days later, writing that he had just returned from vacation, and that he was "working on a proposal to present to you to resolve the outstanding issues, including payment of past due amounts." (TMX Exh. 55).

TECT's plant manager Chuck Gumbert e-mailed Campbell on April 26, stating that "TMX has a substantial amount of plate on their dock ready to ship. I estimate about $1 million worth. They have been holding material at our request for about 6 weeks. Now, we are on credit hold, so all plate is on hold." (TMX Exh. 56).

On May 1, TMX drafted a "contract termination notice" addressed to Campbell, providing "formal notification that we are terminating the [LTA], effective immediately." (TECT Exh. 201). However, the notice was not sent to TECT.

On May 3, Campbell offered Melaik a payment plan of $100,000 per week for 6 weeks. Melaik promised to respond after meeting with TMX's CFO.

Melaik responded to Campbell's offer in an e-mail on May 7: "I spoke with our CFO on Thursday afternoon and was waiting on confirmation of the amount owed, which we will have for you tomorrow morning. Basically, Jim [Wendle] wanted a proposal in writing that included consideration for the full amount owed as well for the higher-priced metal that we've been discussing [payment for the additional 15,000 pounds per month under the October 13, 2006 letter agreement]." (TMX Exh. 176).

The same day, Nishikawa e-mailed Campbell stating that TECT owed $735,718.98.

In a May 9 e-mail to TECT's plant manager, Campbell wrote:

> As our payables past due to suppliers continues to increase, supplier relationships are deteriorating as is supply assurance/reliability. One supplier of subcontract manufacturing (Machine Specialist) will only sell to us on a COD basis. Numerous suppliers are refusing to ship until our payables are current.

(TMX Exh. 58). With respect to TMX, Campbell noted, "The original payment plan [March 30] that we had with them TECT failed to honor. My fear regarding TMX is that they renounce our contract for our non-payment . . ." (*Id.*)

On May 10, Campbell proposed a new "proposed payment plan" to Wendle, under which TECT would make 5 weekly payments of $140,000 and monthly payments of $54,000 for the mill premium for the additional 15,000 pounds of plate per month. (TMX Exh. 59). Campbell sent Wendle an e-mail to memorialize the points they had discussed.

The next day Wendle called Campbell and expressed concern about TECT's financial condition and the possibility of TECT's bankruptcy.

The parties met again on May 17. Bowser presented a plan for payments of $56,000 per week for ten weeks, plus payment of the mill premium in weekly amounts over the remainder of the year.

26

In addition, TECT's corporate parent, UCA Holdings, offered to provide a written guaranty of payment for the remainder of 2007. During the meeting, TMX said that the payment plan was acceptable. The plan did not require TMX to release material upon receipt of payment. Bowser also indicated that "we [TECT] might not need all 900,000 in the [October 2006] contract." (TECT Exh. 116). Bowser memorialized the May 17 payment plan in an e-mail the next day to Wendle and Melaik.

After this meeting, TMX expected to receive from TECT immediate payment of the first weekly amount. When it did not appear, TMX began drafting a letter for the possible cancellation of the LTA.

On May 18, TECT's plant manager authorized a spot buy of aluminum plate from GKN.

By May 24, Bowser had approved a decision not to make the first weekly payment contemplated by the May 17 plan.

TMX was never provided an executed guaranty from UCA Holdings. On May 25, TECT sent a draft of UCA's guarantee.

On May 31, Walt Bowser from TECT had a telephone call with Jim Wendle of TMX. Wendle raised the issue of renegotiating the terms of the Long Term Agreement for 2008 and 2009.

On June 1, Bowser sent a revised 2007 forecast to Melaik showing that TECT would require only about 496,000 pounds of aluminum plate in 2007, as compared with the 900,000 pounds called for in the October 16, 2006 letter agreement.

On June 4, Melaik e-mailed to Bowser a letter from TMX President Funke, which attached a new Payment Plan Agreement prepared by TMX, along with a proposed Payment Guaranty to be executed by UCA Holdings. In the letter, Funke addressed the revised forecast:

> As we have communicated, it is extremely important for us to adjust our current and incoming inventories to match TECT's forecasted demand. After reviewing your requirements for the balance of 2007 sent on Friday, June 1, it is clear that you will be requiring significantly less than the 900,000 pounds committed to at the end of last year. We have included a provision in the payment plan document that addresses this.

(TMX Exh. 73).

The Payment Plan Agreement addressed this issue as follows:

> TECT acknowledges its responsibility for the cost of the material in stock at TMX, as well as incoming procured to specifically support this contract, and agrees to use its best efforts to work with TMX and the mill to reduce the amount held in inventory by TMX. At the end of 2007, any material that is left over in TMX inventory, TECT agrees to consume this balance no later than June 30, 2008. TECT agrees to pay TMX interest on the value of said balance at a rate of twelve percent (12%) per annum.

(*Id.*) The Plan also provided:

> In consideration of the foregoing, TMX agrees to continue to supply TECT with sales and services in accordance with the [Long Term Agreement] but under the terms of payment-in-advance through December 31, 2007, or as required to deplete inventory. Excluding inventory commitments as addressed in paragraph 3, any sales or services after that date shall be provided on the condition that the parties negotiate and agree to mutually-satisfactory terms and conditions. . . .

(*Id.*)

Melaik also wrote an internal e-mail: "It looks like we have way too much on order to support TECT's existing requirements. Would you guys double-check my analysis? After doing so, let's start canceling/changing mill incoming accordingly." (TECT Exh. 13).

On June 11, Bowser responded with a revised written payment plan. Among other things, the plan provided at ¶ 3 that the parties would rescind all terms of the October 13, 2006 letter, except for the pricing for the additional 15,000 pounds of plate per month. In addition, Bowser also wrote "TECT has not guaranteed, and is not otherwise committed, to purchase any products from TMX under the LTA or October 13 Letter except for the requirements that are expressly set forth in the LTA." (TMX Exh. 78). The June 11 plan also requested a $430,260 setoff for a 2006 spot buy; this was the first time that TECT had made a specific demand for TMX to pay the extra cost of the 2006 spot buy.

TECT stresses that TMX began working to reduce the orders from the mills in June of 2007. But this followed the earlier announcement by TECT that they would not be requiring the 900,000 pounds called for by the October 2006 agreement. Further, there is no evidence that TECT opposed these efforts to align the 2007 mill orders with TECT's latest 2007 forecasts.

28

On June 15, Bowser met with Wendle and Melaik and they discussed "TECT counteroffer items." (TMX Exh. 79).

On June 22, TMX drafted a demand for adequate assurances to TECT. The letter was not sent, because "Jim Wendle thought that he was making progress with Walt Bowser and made a decision not to send it." (Melaik dep. at 188).

On June 26, Bowser and Wendle had a telephone conversation in which Wendle reiterated that TMX wanted a new agreement beginning January 2008.

On June 29, Bowser began drafting a proposed response to Wendle following their June 26 telephone conversation.

On July 3, Bowser, Wendle, and Patrick Schatz had a telephone conversation. At this point, Wendle said that TMX's offer was "off the table unless [TECT] agree[s] to terminate LTA remainder." Bowser said he could not authorize the proposals made by Wendle without authorization from the TECT board. (TMX Exh. 86).

On July 12, Bowser offered to wire TMX $300,000 if TMX would release shipments to TECT. Melaik, responded by e-mail that "we'd like to wait until we have a final payment and contract plan ironed out before moving forward with shipments." (TMX Exh. 92).

In a  July 17 e-mail response to Cessna's July 12 email, Tim Hassenger, TECT Aerospace President,  asked Cessna to pay the "$792K in raw material commitments that TECT incurred for 2007 production." (TMX Exh. 96). This refers to the cost of cover for the spot buys.

Melaik sent another payment plan and guaranty to Bowser on July 26. This plan allowed TECT until December 2008 to take the 2007 material and it provided that no premium payments would be due after August 2007. However, it required the cancellation of the LTA at the end of 2007, and negotiations to reach mutually agreeable pricing in 2008 and 2009.

The parties met the next day. Afterwards, Hassenger reported to Cessna "[n]ot surprisingly, they weren't 'happy' to hear our point of view . . . [t]hey also did not change their position." (TMX Exh. 102).

TECT contends that the outstanding payments were not the key element of the dispute – that TMX was using the occasion to force a renegotiation of the LTA, citing notes related to the meeting: "Told him we could not honor '03 pricing even if things paid down." TMX challenges the use of these notes as unauthenticated hearsay. However, the notes appear in material produced by TMX, and Funke has testified that the handwriting is that of TMX executive Kerry Batchelder. Further, the evidence is not cited for the truth of the matter asserted (whether 2003 prices would remain in effect) but to show TMX's intention to escape from the provisions of the LTA.

On July 30, TMX drafted a letter cancelling the Long Term Agreement "due to default," citing "delayed payments and reduced volumes." (TECT Exh. 41). The letter was not sent.

On August 1, Funke sent TECT a letter whereby TMX advised that it considered the LTA cancelled as of December 31, 2007. In the letter, Funke offered two reasons for the cancellation: (1) "Following our meeting on Friday, July 27, it is clear we are unable to reach a consensus regarding the terms cited in the attached payment plan agreement", and (2) "we have incurred significant risk by procuring contract and premium-priced inventory to support your [original] forecasted demand." (TMX Exh. 104). Because of the "increased financial exposure resulting from delayed payments and reduced volumes" TMX offered to negotiate "a new agreement that adequately addresses our concerns." (*Id*). The letter concluded,

> Between now and December 31, 2007, we are still willing to supply aluminum plate at the prices in the LTA, provided that the current account receivable in the amount of $560,000 is first fully paid and provided that such shipments are on the terms payment-in-advance. In the alternative, if you are willing to execute the attached payment plan agreement and deliver the guaranty referred to therein, we are willing to supply material in accordance with that agreement.

> Please note that while we are willing to ship in volumes less than that stipulated in the LTA, we do not thereby waive any claims arising out of TECT's failure to comply with the requirements of the LTA or the related volume commitment.

(TMX Exh. 104).

TMX did not sell any plate to TECT after the credit hold was imposed. During the last half of 2007, the parties had an arrangement whereby TMX, with TECT's prior consent, sold aluminum plate to Cessna and Avcorp for drop shipment to TECT.

30

In spite of its cash flow issues, TECT continued to make payments to TMX throughout 2007 prior to TMX's cancellation. Those payments totaled $636,865.11 (January – $46,681.01; February – $170,554.80, May – $250,634.61; July – $168,994.69).

Over the first four years of the Long Term Agreement, between July 2003 and July 2007, TECT paid TMX $5,351,242.20.

TECT argues that if it had paid at roughly the same rate ($109.209.02 per month) over the remaining 29 months of the LTA, it would have paid an additional $3,167.061.50, and that total payments to TMX would therefore have totaled $8,518,303.78). According to TECT, it owed at most $151,723.13 to TMX at the time of the cancellation, so that the amount thus owed represented about 1.78% of the total value of the LTA.

However, TMX disputes these calculations, noting that the amounts owed incorporate only its TECT accounts receivable for August 2007, along with mill premiums for delivered metal. TMX also contends that it was owed some $557,469.13, and that it might further be responsible for any possible payments that TMX might have to make to the mill resulting from the TECT's substantial reduction of the requirements set forth in the October 2006 letter agreement.

**Conclusions of Law**

In its motion for partial summary judgment, TECT argues, first, that TMX breached the LTA in 2006 by failing to supply it with all of its actual requirements for aluminum plate, and that as a result it was forced to make two spot buys from other suppliers. It seeks a determination that it is entitled to $413,808 in damages, representing the difference between the spot buy cover price and the LTA price.

Second, TECT argues that TMX breached the LTA in March of 2007 when it suspended performance, ostensibly because of missed payments. TECT contends that it did not then owe TMX any substantial amount, once the 2006 spot buys are set-off, and that TMX was not entitled to

suspend performance because it had failed to previously seek adequate assurance in writing under K.S.A. 84-2-609.

Third, TECT argues that TMX breached the LTA by its August 1, 2007 letter cancelling the agreement. The cancellation was not valid under the U.C.C., TECT argues, because TMX's communications were either not demands for adequate assurance under § 2-609 or were "excessive" demands seeking the complete renegotiation of the LTA. Further, it argues, TMX had no right to seek adequate assurance, since it was then already in breach by failing to supply its requirements under the LTA. In any event, according to TECT, it supplied adequate assurance to TMX by supplying a guarantee. TECT argues that TMX could not cancel the LTA under K.S.A. 84-2-613(3), since the statute permits such a remedy only where the inadequate performance of the other party substantially impairs the value of the whole contract. And TECT argues that TMX reinstated the contract by accepting payments and demanding performance.

Fourth, TECT argues that TMX's cancellation of the LTA cannot be predicated on a claim that it breached the October 2006 letter agreement. It argues that TMX's own actions (delaying 2006 shipments, imposing the credit hold, reducing mill purchases) prevented it from performing under the latter agreement. It also argues that it never actually repudiated the letter agreement. And, similar to its earlier arguments, it emphasizes again that such breach of the letter agreement did not substantially impair the value of the contract as a whole, and that in any event TMX reinstated the contract by waiting two months, demanding future performance, and failing to give a seasonable cancellation notice.

TMX argues that it did not breach the LTA in 2006 because, as a matter of law, the increase in the actual aluminum plate requirements over the forecasted amount was unreasonable as a matter of law.

TMX also argues that it had good reason to be insecure as to TECT's performance in 2007, and that it never received adequate assurances from TECT. TMX argues because the LTA was an installment contract, under K.S.A. 84-2-612, it was not required to make demands for adequate

assurance for future performance as required under K.S.A. 84-2-609. Alternatively, TMX argues that its e-mail communications in February and on March 19 constituted demands for assurance. Further, it argues that its proposals were not excessive merely because they required additional negotiations as to forecasts and prices for 2008 and 2009.

TMX argues that, even supposing it were in breach for the shortfalls in 2006, this would not prevent it from demanding adequate assurance in 2007, since TECT had never supplied adequate notice of breach as required by K.S.A. 84-2-607. TMX contends that TECT repudiated the October 2006 letter agreement by substantially reducing the amount of aluminum plate to be provided, and that it repudiated the LTA under K.S.A. 84-2-610, and that TECT's failure to perform substantially impaired the value of the contract. TMX argues that its cancellation of the LTA on August 1, 2007, was within a reasonable time of that repudiation.

With respect to its own motion for summary judgment, TMX argues that the TECT's demands in 2006 were unreasonably disproportionate to the estimates in the original LTA within the meaning of K.S.A. 84-2-306, and that as a result it was not obliged to meet those demands. It also argues that the original Cessna-BAE estimates were incorporated into the LTA, and that the contract did not and could not waive the U.C.C.'s mandate that any increases in aluminum plate required under the contract be reasonably proportionate.

TMX also argues that it properly cancelled the LTA in August 2007 once it sought adequate assurance from TECT (informally, by means of various e-mails during February and March of that year), but never received such assurance. TMX argues that the various proposals by TECT (the payment promises or plans of March 30, April 2, May 3, May 10, May 17, June 4, and June 11) could not constitute adequate assurance because in each instance the promise was not honored, failed to address concerns about financial insecurity, or called for modifying the contract between the parties by deleting the October 2006 letter agreement. Finally, TMX argues that the lack of adequate assurance, coupled with a lack of payment on delivered shipments, substantially impaired the value of the contract as a whole, thereby justifying cancellation.

In response to TMX's motion, TECT argues that its 2006 demands were not unreasonably disproportionate. It further argues that TMX's cancellation of the contract was a breach of the LTA, because having already breached the contract by failing to supply TECT's 2006 requirements, TMX was not entitled to seek adequate assurance under K.S.A. 84-2-609. It also argues that TMX was not reasonably insecure, as most of the debt for unpaid shipments was counterbalanced by the expenses TECT incurred for the 2006 spot buys.

TECT also argues that the February e-mails were sent by lower-level management, and do not constitute a demand for adequate assurance. TECT notes that TMX later prepared an explicit demand for assurance on June 22, which was never sent, and that the August 1, 2007 notice cites TECT's failure to respond to the (unsent) June 22 demand as grounds for cancellation. In any event, TECT argues as well that it gave adequate assurance in the June 4 plan under which it provided assurances of payment, coupled with a guarantee of payment. TECT also argues that the October 2006 letter agreement did not commit it to purchase 900,000 pounds of aluminum plate in 2007, but only to buying a minimum of 15,000 pounds per month at premium prices, and that its forecast of purchasing less than 900,000 pounds was not a breach of the letter agreement. Finally, TECT argues that the amounts in dispute were insufficiently small to impair the value of the contract as a whole, and that the alleged lack of adequate assurance was mere pretext. It argues that TMX cancelled the contract because it was unhappy with having to supply aluminum plate at the prices set forth in the LTA.

**Were TECT's 2006 demands unreasonably disproportionate?**

Whether TECT's 2006 requirements for aluminum plate were unreasonably disproportionate to the original 2003 estimates for Cessna production during the term of the LTA is the central issue in the case. It forms the basis for TECT's claim for damages for the 2006 spot buys in its motion for summary judgment, but it also has a collateral effect on the remainder of the case. If the additional requirements were not unreasonably disproportionate, TMX was obliged to supply that plate, and

should be responsible for TECT's spot buys. Further, TECT would have a right to setoff for such

cover buys, thereby significantly reducing the amount TECT owed to TMX in 2007. As a result,

TMX would have had much less reason to feel reasonably insecure about TECT's performance, an

insecurity which it asserts was the basis for its cancellation of the LTA. On the other hand, if the

2006 requirements were unreasonably disproportionate, TMX had no obligation to secure the

material, TECT would have no right of setoff, and TMX would have a significantly greater basis for

claiming it was reasonably insecure about TECT's performance in 2007.

In its response to TMX's motion, TECT does not challenge the TMX's contentions (Dkt. 74

at 35-46) that the LTA was based on the 2003 estimates of Cessna production, that K.S.A. 84-2-306

incorporates the prohibition on unreasonably disproportionate changes from contract estimates, and

that nothing in the LTA did or could waive that prohibition. The sole question, therefore, is whether

the 2003 requirements were indeed an unreasonably disproportionate increase in the original

estimates for production.

Under K.S.A. 84-2-306(1),

[a] term which measures the quantity by the output of the seller or the requirements
of the buyer means such actual output or requirements as may occur in good faith,
except that no quantity unreasonably disproportionate to any stated estimate or in the
absence of a stated estimate to any normal or otherwise comparable prior output or
requirements may be tendered or demanded.

Comment 2 to this section provides that output and requirements are valid and enforceable,

even though they might lack any definite statements of the amount of product to be provided, since

that amount was subject to the limitation of good faith. Further, comment 3 notes, variations in

production under such contracts also must be reasonably proportionate:

If an estimate of output or requirements is included in the agreement, no quantity
unreasonably disproportionate to it may be tendered or demanded. Any minimum or
maximum set by the agreement shows a clear limit on the intended elasticity. In
similar fashion, the agreed estimate is to be regarded as a center around which the
parties intend the variation to occur.

TMX argues that TECT's requirements after 2005 were unreasonably disproportionate,

because they were nearly double the original contract estimates, citing decisions where a party's

35

increased requirements were found to be unreasonably disproportionate. *See Orange & Rockland Utilities v. Amerada Hess Corp.*, 59 A.D.2d 110, 397 N.Y.S.2d 814 (1977); *Shea-Kaiser-Lockheed-Healy v. Department of Water & Power*, 73 Cal.App.3d 679, 140 Cal.Rptr. 884, 888 n. 5 (2nd App. Div. 1977) (doubling of utility prices was unreasonably disproportionate); *Waste Stream Environmental, Inc. v. Lynn Water and Sewer Com'n*, 2003 WL 917086, 15 Mass.L.Rptr. 723 (Mass. Super. 2003); *State of Washington Dept. of Fisheries v. J-Z Sales Corp.*, 25 Wash.App. 671, 678 (1980) (holding in dicta that "the output of more than three times the estimated amount of salmon eggs, and of nearly two-thirds more than the estimate for salmon carcasses, in the falling market conditions then prevalent, created for J-Z Sales a genuine concern about the price it was being asked to pay").

In *Waste Stream Environmental*, the court noted that the majority of cases addressing the issue "focus heavily on the specific quantity estimate (usually a specific number) contained in the contract, comparing it to the actual resulting overage." 2003 WL 917066, at *9.[4] However, while such comparisons are useful in determining proportionality, they are not the exclusive or best approach. Comment 2 recognizes that the analysis of unreasonably disproportionate also includes questions of good faith and foreseeability – "a sudden expansion of the plant by which requirements are to be measured would not be included within the scope of the contract as made but normal

---

[4]The California court stated that the

[r]elevant cases include: *State of Wash., Dept. of Fisheries v. J-Z Sales Corp.*, 25 Wash.App. 671, 678 (1980) (citing other case law and finding the following amounts to be unreasonably disproportionate: 20% over stated estimate, "double the estimate," "three times the estimated amount of salmon eggs," and 66% over the estimates for salmon carcasses); *A & A Mechanical* [*v. Thermal Equip. Sales*], 998 SW.2d [505,] 512 [(Ky. App. 1999)] (finding a 29% overage to be unreasonable, and citing cases that found 15% and 20% overages to also be unreasonable).

expansion undertaken in good faith would be within the scope of this section" K.S.A. 84-2-306,

Comment 2.[5]

> Thus, in the leading case of *Orange & Rockland*, the court observed:

> It would be unwise to attempt to define the phrase "unreasonably disproportionate" in terms of rigid quantities. In order that the limitation contemplated by the section take effect, it is not enough that a demand for requirements be disproportionate to the stated estimate; it must be unreasonably so in view of the expectation of the parties. A number of factors should be taken into account in the event a buyer's requirements greatly exceed the contract estimate. These include the following: (1) the amount by which the requirements exceed the contract estimate; (2) whether the seller had any reasonable basis on which to forecast or anticipate the requested increase; (3) the amount, if any, by which the market price of the goods in question exceeded the contract price; (4) whether such an increase in market price was itself fortuitous; and (5) the reason for the increase in requirements.

59 A.D.2d at 115-16, 397 N.Y.S.2d at 819 (citations omitted).[6]

> In *Orange & Rockland*, the court struck down as unreasonably disproportionate an increase

under a fuel oil requirements contract which represented a near doubling of previous estimates. But,

in doing so, the court expressly disavowed the adoption of any simple measure of proportionality:

> We hold *under the circumstances* of this case, any demand by plaintiff for more than double its contract estimates, was, as a matter of law, "unreasonably disproportionate" to those estimates. *We do not adopt the factor of more than double the contract estimates as any sort of an inflexible yardstick.* Rather, we apply those

---

[5]White and Summers observe:

Sellers are not, however, automatically entitled to resist demands of buyers [under requirements contracts] for any and all large increases. Sellers sometimes have reason to anticipate large increases. When the contract has a fixed price, the seller should anticipate increased demand from the buyer if market prices rise. Finally, one *raison d'etre* of a requirements contract is to allow a buyer some flexibility in the size of its orders. In a proper case the court may sanction a sizable increase. Indeed, where the increase is gradual and the buyer is not found to be acting in bad faith, a court may permit an increase that is extremely large.

James J. White & Robert S. Summers, UNIFORM COMMERCIAL CODE § 3-9, at 140 (5th ed. 2000).

[6]*See also Waste Stream Environmental*, 2003 WL 917086, at *10 (holding as to contract for the disposal of wastewater sludge that an increase of 400% in sludge was unreasonably disproportionate, the increase occurring after "the unpredictable and unforeseeable incinerator explosion").

> standards set forth earlier in this opinion, which are calculated to limit a party's risk
> in accordance with the reasonable expectations of the parties.

59 A.D.2d at 120, 397 N.Y.S.2d at 821-22 (emphasis added). In applying those standards, the court found that there was "ample evidence to justify a finding of lack of good faith" on the part of the seller, and that "an increase of the magnitude" presented in that case was "unforeseeable" to "a prudent seller of oil." 59 A.D.2d at 116, 397 N.Y.S.2d at 819. *See also Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 582 (Tex, 1996) (Phillips, C.J., concurring and dissenting) (unreasonably disproportionate should be determined by reference to "the parties' expectations [as reflected by] past performance under the contract [and] the original expectations of the parties as well as the industry context in which their agreement was made").

The court finds that the evidence submitted precludes summary judgment on the issue, and whether TECT's requirements after 2005 were unreasonably disproportionate will be resolved by the trier of fact.

Certainly, the size of the increase in TECT's requirements may provide a basis for the finder of fact to conclude that the increase was unreasonably disproportionate. However, consistent with *Orange & Rockland*, the court must also look to additional factors, such as the underlying reason for the increase, and whether that reason was fortuitous or foreseeable.

Evidence from the course of dealing between the parties is equivocal. As noted earlier, TECT argues that the communications between the parties show that TMX knew it was obliged to supply its increased requirements. It is true there is no direct rejection of those demands as unreasonably disproportionate, and TMX worked to increase its own supplies of aluminum plate from Pechiney. But a rational fact-finder could conclude that TMX did so as an accommodation to its customer TECT, not because it felt it was bound to do so by the LTA. Further, the facts indicate that TMX billed TECT for aluminum plate at non-LTA prices.

On the other hand, TMX points to attempts by TECT to obtain coverage for its spot buys from Cessna, and its general failure to insist on TMX supplying all its requirements. But while this is generally true, at least one TECT manager (David Nolletti) wrote to TMX stating that it would

be "held responsible for costs incurred by TECT." Although this notice does not explicitly include the costs of TECT's spot buy, for summary judgment purposes the court must infer that this was the intention. Further, a rational fact-finder could conclude that TECT's seeking some compensation from Cessna for the costs of the increased production is not necessarily inconsistent with the belief that TMX also shared such responsibility.

Of greater relevance is the positive response by Mirt in his deposition to counsel's question asking whether the aluminum plate shortage was "almost the perfect storm." (Mirt dep. at 93). Martin also agreed with this characterization. (Martin dep. at 57). Mirt's testimony occurred while discussing his Thanksgiving 2004 article in the company newsletter where he expresses the wish to have had a "crystal ball" in order to foresee that shortage. (TMX Exh. 128).

Against this, however, there are other considerations which weigh against an award of summary judgment. In the same newsletter, Mirt attributed the shortage to a variety of factors, including "the huge export demand to China, the Airbus A380 and the closing of the McCook plant this year." There is no evidence at all before the court as to whether these contributors to the aluminum plate shortage were or were not foreseeable at the time the parties entered into the LTA.

More importantly, TMX's expert has acknowledged the extremely cyclical nature of the aluminum market, and TECT's expert has testified that in 2003, aircraft production was at a historical low. TMX correctly stresses that both experts stated that they could not predict with any accuracy *when* the market turn-around would occur. However, while this may be relevant to the ultimate fact-finder, it is not controlling here. The point is that while the *timing* of the market rebound was uncertain, the ultimate rebound itself was not; the possibility of a market rebound was foreseeable. Kelly testified the rebound would probably occur within five years – that is, within the life of the LTA. (TMX Exh. 128).

Here, the LTA expressly tied the requirements to Cessna's production, and warned that Cessna's needs could fluctuate during the course of the contract. Unlike *Orange & Rockland*, where the court found persuasive evidence of a lack of good faith, here TMX makes no suggestion of a lack

of good faith on the part of TECT. Nor was the aluminum shortage here the equivalent of the wholly unforeseen industrial plant explosion, as in *Waste Stream Environmental*. Rather – if TECT's evidence is believed – at the time of the LTA there was a reasonable and foreseeable possibility that Cessna's production could rebound significantly during the life of the LTA. TMX could have negotiated a shorter term or for a maximum amount to be supplied under the agreement, but it did not do so.

**The October 2006 letter agreement**

The parties dispute whether the October 2006 letter agreement is binding between the parties, and, if it is, the terms of the agreement are. TECT argues that Martin was a lower level manager who had no authority to bind it, and that the agreement only called for TECT to purchase 15,000 pounds of aluminum plate at premium prices; it did not actually commit TECT to buying a full 900,000 pounds of plate in 2007. TMX submits that there is evidence from which a rational fact-finder could conclude that Martin had actual or apparent authority to bind TECT, but for summary judgment purposes, relies on the contention that TECT ratified the letter agreement through the course of its performance. It further argues that TECT then breached the agreement when it later forecasted using less than 900,000 pounds of plate.

The court finds that summary judgment should not be awarded as to whether the letter agreement became an enforceable contract between the parties. The only evidence cited by TMX in support of its ratification argument is TECT's supposed admissions in two pleadings that it ratified the letter agreement. But, as noted earlier, in those pleadings TECT indicated only that it ratified the agreement for premium pricing.

TMX argues that TECT cannot ratify only a part of the letter agreement. Whether there was ratification of the letter agreement will be an issue for the trier of fact. It may be that TECT ratified the entire agreement. But proof of such a ratification will require proof beyond the expressly qualified admissions TMX cites.

40

However, the court will grant summary judgment as to the scope of the letter agreement. That is, the court finds that the manifest intention of the letter agreement was not merely to provide for premium pricing, but to also purchase a specific amount of plate. The language of the agreement is not ambiguous. In exchange for TMX's undertaking to obtain the required plate from its own supplier, "TECT agrees to purchase 75,000 pounds per month or 900,000 pounds over the course of 2007." Accordingly, the court finds that (if the letter agreement is found to be enforceable) any actions taken by TECT which would repudiate this obligation could constitute a breach.

**Was TMX reasonably insecure?**

TMX argues that by 2007 it was reasonably insecure about TECT's willingness and ability to follow the terms of the LTA. It contends that it sought reasonable assurance from TECT as to TECT's future performance, and that the failure of TECT to supply such assurance constituted an anticipatory repudiation of the LTA. Because this repudiation substantially impaired the value of the LTA, it properly cancelled the contract.

TECT argues that TMX was not reasonably insecure, because any debts it owed to TMX in 2007 were largely compensated for by its right to setoff for the 2006 spot buys. TECT argues that TMX could not have been reasonably insecure because it knew through communications by Martin and Nolletti that it was seeking a setoff for the spot buys, and that "it makes no sense" for TMX to wait six months before cancelling the contract if it was in fact genuinely insecure in early 2007.

Under K.S.A. 84- 2-609(1)

[w]hen reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

The court finds that summary judgment should not be granted on this issue. Certainly TMX has presented evidence from which a rational fact-finder could conclude that there were reasons for insecurity. TECT had exceeded its credit limit and had asked TMX to hold shipments at TMX's dock until further notice. At a meeting on March 16, 2007, Ray Campbell of TECT stated that the

41

company was in "big financial distress." However, it appears that a substantial portion of the difficulties between the parties arose following the 2006 spot buys. As noted above, the court finds whether TMX was obliged under the LTA to supply all TECT's requirements remains a question for the finder of fact. Accordingly the court will not grant summary judgment on the question of whether there was or was not reasonable insecurity.

**Did TMX demand assurance?**

TMX argues that, faced with TECT's late payments and financial difficulties, it then sought to gain some assurance from TECT that it would continue to honor the LTA.[7]  TECT argues that none of the various communications from TMX constituted a request for assurance within the meaning of K.S.A. 84-2-609. Since there was no request for assurance, TECT argues, TMX's unilateral decision to suspend further performance in March 2007 was a breach of the contract. Further, because TMX was already in breach, it cannot invoke the remedies of K.S.A. 84-2-609.

The court finds that fact questions exist as to whether TMX was entitled to seek assurance under § 2-609. Again, the question of whether TMX was in breach for failing to supply TECT's 2006 requirements must be resolved at trial. Accordingly, the court will deny summary judgment on the issue of whether TMX had the right to demand assurance.

---

[7]In its brief in support of its motion for summary judgment, TMX cites a series of e-mails that it made direct (if informal) demand for payments and thus "constitute a sufficient demand for adequate assurances under K.S.A. 84-2-609." (Dkt. 74 at 54). In its Response to TECT's motion, however, TMX also makes that suggestion that, because the LTA was an installment contract, it was not required to make a demand for assurance prior to its suspension of deliveries. (Dkt. 79 at 59) (*citing Revlon, Inc. v. Century Publishing Co.*, 1983 U.S. Dist. LEXIS 17332, *26 (N.D. Ill. April 28, 1983). The cited authority, however, makes clear that such suspension in the case of installment contracts is justified only if the failure to pay substantially impairs the value of the contract. Yet TMX has elsewhere conceded that the late payments by themselves did not justify cancellation of the contract. It was the "past due balances [combined with] TECT's failure to provide adequate assurances of its ability to pay ... that establishes ... substantial impairment." (Dkt. 74 at 57).

The parties dispute whether the e-mails between the parties prior to June 4 constitute demands for assurance under § 2-609(1).[8] Beyond the requirement that it be in writing, the statute itself contains no explicit provision for the form or content of a demand for assurance. As the Kansas comment to the statute emphasizes, "courts construe that requirement liberally." K.S.A. 84-2-609, Kansas comment, ¶ 2 (*citing LNS Inv. v. Phillips 66*, 731 F.Supp. 1484, 1487 (D.Kan. 1990) (*citing AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167 (7th Cir. 1976). In AMF, the Seventh Circuit found that the liberal construction of the U.C.C. precluded "a formalistic approach to Section 2-609." 536 F.2d at 1170-71 (*citing Pittsburgh-Des Moines Steel v. Brookhaven Manor Water*, 532 F.2d 572, 581 (7th Cir. 1976).

As the Kansas comment further makes clear,"[w]hat constitutes reasonable grounds for insecurity and what assurance may be demanded are questions of fact." *Id. See also AMF*, 536 F.2d at 1170. In addition, whether a given demand is adequate to put the other party on notice of the need for adequate assurances is also a question of fact. *USX Corp. v. Union Pac. Res.*, 753 S.W.2d 845, 853 (Tex. App. 1988).

The court grants summary judgment in favor of TMX as to whether or not it sought adequate assurance under § 2-609. TMX cites to a variety of communications including a February 20 e-mail from TMX to TECT which states that "there are some unpaid invoices that need to be taken care of." Another e-mail sent the next day asked TECT to address the issue of paying invoices "after your net 45 terms," and asked TECT for financial statements and to "please let us know how much more" in credit it was seeking. An e-mail on March 19, 2007, states that in light of the credit hold "we cannot release any orders" to TECT.

TECT argues that the earlier e-mails cannot constitute a demand for assurance, citing *Alaska Pac. Trading. v. Eagon Forest Prods.*, 933 P.2d 417, 421 (Wash. Ct. App. 1997) (§ 2-609 "requires

---

[8]TMX previously contended that the June 4 payment plan constituted a demand for assurance. TECT has argued  that the June 4 plan cannot constitute a demand for assurance under § 2-609 because its demands are excessive, requiring a wholesale re-negotiation of the LTA. In its response, TMX identifies as demands for assurance only those communications occurring on or before May 18, 2007. (Resp. at 59-60).

a clear demand so that all parties are aware that, absent assurances, the demanding party will withhold performance"). Further, it notes that TMX submitted more comprehensive demands on June 4 in the new payment plan and prepared (but did not send) on June 22 a formal demand for assurance under Section 2-609. TECT argues that the earlier communications thus were not intended to serve as demands for assurance.

It is possible that TMX prepared the June 22 demand because it believed the earlier e-mails were insufficient. On the other hand, it may have prepared it out of an abundance of caution, but ultimately concluded that it was unnecessary to send the notice precisely because those earlier communications were demands under § 2-609. Ultimately the subjective intent of TMX is not relevant. What is controlling is whether a reasonably prudent buyer in TECT's position, upon receiving the cited e-mails during February and March of 2007, would have concluded that TMX planned to suspend performance in the absence of assurance.

And the answer is that such a prudent buyer would have reached such a conclusion. The email of February 20 explicitly refers to "unpaid invoices that need to be taken care of," and explicitly states that an additional order "cannot be released until it is solved." An e-mail of February 21 provides that the pending order would be released, but that additional orders would require TECT to adhere to the LTA's payment requirements. On March 19, 2007, an e-mail from TMX noted that "until we get further notice from upper management, we cannot release any orders."

The court finds that the cited communications constitute a demand for assurance within the meaning of § 2-609.


**Did TECT provide adequate assurance?**

TMX argues that the various payment plans and proposals developed by the parties from March through June of 2007 cannot constitute adequate assurance because TECT either failed to comply with the terms of the plans because they did not address the issue of financial insecurity, or because the proposals would force it to abandon the October 2006 letter agreement and require it

to set off the costs of TECT's spot buys. TECT argues that it provided adequate assurance by giving assurance of payment coupled with a guaranty from its corporate parent, and that TMX cancelled the contract because it sought to escape the restrictions of the LTA.

In contrast, TECT argues that the guarantee offered by its corporate parent should be deemed as a matter of law to constitute adequate assurance, citing an unpublished *per curiam* decision in *Precision Master v. Mold Masters*, No. 03-033520, 2007 WL 2012807 (Mich. App.,2007) (*per curiam*). In that case, however, the court did not hold that any "offer of a third party guarantee is adequate assurance as a matter of law." (TECT Reply at 23). Rather, it held that a defendant's provision of a "a letter of credit from a bank, requiring its payment of defendant's obligations under the specified contractual time frames" was adequate assurance in the context of applicable commercial standards. *Id*. at *4. Further, it contrasted this assurance to the demands of the plaintiff, which "demanded alteration of the actual contractual terms by requiring payments C.O.D., the initiation of interest on late payments, and other requirements ... in actuality comprised a unilateral attempt to alter and favorably enhance the contractual provisions." *Id.*

The determination of whether adequate assurances were given must combine consideration of both the specific remedy that is offered (here, a guarantee from a related corporate entity rather than an independent bank) and the original grounds for insecurity. That decision is a "difficult task" that reflects a combination of "common sense and reasonable business practices." White & Summers, Uniform Commercial Code, § 6-2, at 199.

As noted earlier, whether or not assurance is adequate under § 2-609 is a question of fact. Here, the court has found the questions of 1) whether the October 2006 letter agreement was an enforceable contract between the parties, and 2) whether TECT is or is not entitled to setoff for the spot buys, are questions which must be resolved by the trier of fact. It will remain for the trier of fact to determine, under all of the circumstances of the case, whether TECT's proposals were adequate assurance to TMX.

**Was the value of the contract substantially impaired?**

The parties dispute whether TMX properly cancelled the LTA on August 1, 2007. In its motion, TECT argues that the cancellation was a breach, since the amount then in dispute was minor (according to TECT approximately 1.8% of the total payments of $8-9 million over the life of a fully-performed LTA), and thus did not substantially impair the value of the contract under K.S.A. 84-2-612(3). TMX contends that the failure of the parties to reach agreement as to a payment plan, coupled with the absence of adequate assurance, substantially impaired the value of the contract, justifying termination of the agreement under K.S.A. 84-2-610 as an anticipatory repudiation.

K.S.A. 84-2-612(3) provides for a remedy in case of breach of an installment contract:

> Whenever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he accepts a nonconforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments or demands performance as to future installments.

K.S.A. 84-2-610 provides for a variety of remedies to the non-aggrieved party in the event of anticipatory repudiation:

> When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may
>
> (a) for a commercially reasonable time await performance by the repudiating party; or
>
> (b) resort to any remedy for breach (section 84-2-703 or section 84-2-711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and
>
> (c) in either case suspend his own performance or proceed in accordance with the provisions of this article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods

The term "substantial impairment" is not explicitly defined in the UCC. *Mold-Tech UNITED STATES, LLC v. Holley Performance Products*, No. E2004-01938, 2005 WL 2051289, *6 (Tenn.Ct.App. Aug. 25, 2005). Official comment 3 to U.C.C. § 2-610 states that "[t]he most useful test of substantial value is to determine whether material inconvenience or injustice will result if the

46

aggrieved party is forced to wait and receive an ultimate tender minus the part or aspect repudiated." The Tenth Circuit has found that "the question of 'substantial impairment' under the Code presents a question of fact." *Bill's Coal v. Board of Pub. Utils.* 887 F.2d 242, 247 (10th Cir. 1989) (citing cases). *See also McGilbray v. Scholfield Winnebago*, 221 Kan. 605, 611, 561 P.2d 832, 837 (1977) (applying K.S.A. 84-2-608 and holding that "[w]hat constitutes substantial impairment of value ... is a factual determination to be made by the trier of fact"). [9]

> In *Bill's Coal*, the Tenth Circuit wrote that under K.S.A. 84-2-612(3),
>
> [t]he issue ... is whether a "non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract. The Official Comments to section 2-612(3) expressly state that this subsection "is designed to further the continuance of the contract" and that "[w]hether the non-conformity in any given installment justifies cancellation as to the future depends, not on whether such non-conformity indicates an intent or likelihood that the future deliveries will also be defective, but whether the non-conformity substantially impairs the value of the whole contract." UCC § 2-612, Official Comment 6.

887 F.2d at 248.

In support of its argument, TMX relies in particular on the Tenth Circuit's decision in *L&M Enterprises v. BEI Sensors & Sys.*, 231 F.3d 1284 (10th Cir. 2000), where the court upheld an award of summary judgment in favor of the seller that the buyer's non-payment had substantially impaired the value of the contract. The issue in *L&M Enterprises* involved cancellation for non-payment under K.S.A. 84-2-703(f), but the court agreed that the same standard of substantial impairment existed as under § 2-612(3). In affirming the award of summary judgment, the court distinguished *Bill's Coal*, where it had found that such a determination is a factual question.

---

[9]Commentators have also recognized that the issue of insecurity will ordinarily be determined by the trier of fact:

> Whether a party has reasonable grounds of insecurity depends upon many factors including the seller's exact words or actions, the course of dealing or performance between the particular parties, and the nature of the industry. What constitutes reasonable grounds for insecurity in one case might not in another. Consequently, the trier of fact must normally answer whether grounds for insecurity exist.

White & Summers, UNIFORM COMMERCIAL CODE, § 6-2, at 197 (footnote omitted).

*Bill's Coal Co.*, however, involved a factual question of whether non-conforming coal shipments substantially impaired the value of the contract. *See* 887 F.2d at 247-48. In the instant case, L & M completely failed to make timely payments. We agree with the courts that have held implicitly that an undisputed failure to pay for shipments establishes, as a matter of law, substantial impairment justifying cancellation as to the future undelivered balance of a contract. *See, e.g., Heating & Air Specialists* [*v. Jones*], 180 F.3d [923,] 933-34 [(8th Cir. 1999)]; *Frigiking, Inc. v. Century Tire & Sales Co.*, 452 F.Supp. 935, 938 (N.D.Tex.1978).

L & M argues that *Frigiking* is distinguishable from this case because of L & M's allegations of BEI's breach, efforts to reduce the debt, and a repayment agreement. These distinctions do not persuade us of the existence of a material dispute as to justification for cancellation. We fail to see how BEI's alleged breaches of the contract in February and March 1996 are material to the question of its justification for cancellation, a justification which arose prior to those alleged breaches. As of February 12, 1996, L & M was already overdue as to payments under the November 1995 agreement.

231 F.3d at 1288.

*L&M* represents the rare case, however. While "[i]t is possible to conclusively establish substantial impairment of the value of a whole contract[,] given the subjective nature of this issue, it is typically regarded as an issue of fact for the jury." *Bayer Corp. v. DX Terminals*, 214 S.W.3d 586, 594-95 (Tex.App. 2006) (citing *L&M Enterprises* and other cases). In *L&M*, as the court stressed, the seller had "completely failed to make timely payments." *Id.* Further, the court ruled, it was unnecessary to address claims of the buyer's alleged breaches, as they occurred *after* the seller's failure to pay. In the present case, by contrast, there is evidence showing that TECT continued to make payments during 2007. Further, as noted earlier, there are allegations that TMX had previously breached the contract by failing to supply TECT's requirements in 2006. The court finds that the trier of fact must determine whether there was a failure to provide adequate assurance that substantially impaired the value of the entire contract.

**Did TMX reinstate the contract?**

Finally, the parties dispute whether TMX, if it was entitled to cancel the LTA, somehow lost the right by waiting too long or by reinstating the contract through its actions. TECT, relying on the unpublished *per curiam* decision in *Precision Master v. Mold Masters*, No. 03-033520, 2007 WL

2012807 *4 (Mich. App. 2007) ("mere objection to the untimely payments is not commensurate with outright repudiation or notification of cancellation"), argues that TMX reinstated the LTA when it demanded performance as to future installments, and accepted non-conforming installments (in the form of late payments) without a seasonable notice of cancellation. It also cites *Traynor v. Walters*, 342 F.Supp. 455, 461 (D. Pa. 1972) (holding that "the buyer reinstated the contract on December 14 by demanding delivery in future installments of yet undelivered Douglas Fir and Colorado Blue Spruce").

The court finds that TMX – assuming it otherwise had valid grounds for cancelling the LTA – did not reinstate that contract merely by seeking assurances as to performance (which it had a right to do under § 2-609(1) and § 2-610) or by accepting the payments from TECT. The manufacturer defendant in *Mold-Tech* presented a similar argument, also based on construing late payments as "nonconforming installments" with in the meaning of § 2-609(3).

> We disagree with the Manufacturer's contention. Tenn. Code Ann. § 47-2-612(3) deals with a situation where a party "accepts a nonconforming installment." The Manufacturer would have us read this provision as applying to a seller who accepts a payment for goods previously delivered; but this is not what subsection (3) of the statute says. There is nothing in the statute to indicate that a "nonconforming installment" includes a payment on an account. Furthermore, subsection (1) of the statute makes it clear that the statute is intended to address the delivery of goods in installments. The "nonconforming installment" referred to in subsection (3) is a nonconforming installment of goods. This statute is simply not implicated by the facts of the instant case.

2005 WL 2051289, at *7.

TECT also argues that TMX reinstated the contract by waiting too long to cancel the contract. It stresses that under K.S.A. 84-2-609(4), a repudiation occurs if adequate assurance is not provided "within a reasonable not exceeding 30 days" of the aggrieved party's demand. Since the demands for adequate assurance occurred in February 2007, the ultimate cancellation was four months after the repudiation. Consequently, it argues, quoting language from *LNS Investment*, 731 F.Supp. at 1488, TMX "lost its right to cancel the contract by failing to elect that remedy within a reasonable time."

49

The court finds no basis for the relief sought. The language from *LNS Investment* is dicta, since the court was merely responding to a hypothetical – that "defendant was arguably entitled to cancel the contract soon after plaintiff's unacceptable performance began." *Id.* The court proceeded by explaining that the issue was irrelevant because "the above circumstances [the poor performance] were sufficient to establish defendant's right to adequate assurance of plaintiff's future performance under K.S.A. 84-2-609." *Id.* Further, the "reinstatement" under § 2-612(3) arises after a nonconforming shipment is accepted. As noted earlier, the statute does not apply where a seller accepts late payments. *See Bartlett & Co. v. Curry*, 1 Kan.App.2d 242, 563 P.2d 1096 (1977) (rejecting argument of reinstatement under § 2-612(3) and holding that a "seller's acceptance of nonconforming performance cannot be equated to a buyer's acceptance of nonconforming goods as provided therein").

Lastly, even if cancellation was required within a reasonable time, TECT has failed to present evidence from which a rational fact-finder could conclude that TMX's cancellation was so untimely as to reinstate the contract. While several months did elapse before the ultimate August 1, 2007 cancellation, it also remains true that during this time the parties were negotiating their duties under the *Long Term* Agreement, a contract which had been in place for several years and which had several more years to run. During the interim, the parties actively engaged in a series of meetings and communications about the LTA, and numerous payment plans were produced to address TMX's concerns. Even if (the court assumes for purposes of this issue) these communications did not provide adequate assurance to TMX, they remain relevant as potential justification for TMX's failure to cancel the contract sooner. TECT has failed to present any authority showing the delay of a few months, during which buyer and seller are actively negotiating differences as to a long-term contract, is so commercially unreasonable that an aggrieved seller loses all right to cancel the contract.

In summary, the court will grant summary judgment as to the following issues: (1) the October 2006 letter agreement [assuming it is binding between the parties] unambiguously requires

50

TECT to buy during 2007 aluminum plate in an amount equivalent to 75,000 pounds monthly or 900,000 pounds total; (2) in its communications with TECT beginning in February of 2007, TMX sought adequate assurance within the meaning of K.S.A. 84-2-609; and (3) TECT did not otherwise reinstate the LTA. The motions for summary judgment are otherwise denied.

Also before the court is plaintiff's request for a surreply. TECT wishes to submit argument relating to the alleged ratification of the October 2006 letter agreement, an issue which it contends (Dkt. No. 92-2, at 2) was first raised in TMX's Reply in support of its Motion for Summary Judgment. In fact, the TMX raised the issue in its original Memorandum in Support, as well as in its Response to TECT's Motion (Dkt. No. 74 at ¶ 81; Dkt. No. 79-2 at 23). The request for a Surreply is denied.

IT IS ACCORDINGLY ORDERED this 25th day of September, 2009 that the plaintiff's Motion for Partial Summary Judgment (Dkt. No. 69) and Motion for Leave (Dkt. No. 91) are denied; defendant's Motion for Summary Judgment (Dkt. No. 74) is granted as provided herein and otherwise denied.

s/J. Thomas Marten
J. THOMAS MARTEN, JUDGE